Thank you, Your Honor. Good morning. May it please the Court. John Williams on behalf of Appellant Dr. Yocum. I intend to reserve two minutes of my time for rebuttal. I'd like to put a finer point on the key issues in this case, and I'm going to start with the source of the public policy for the TAMNI claim. The California Supreme Court has made clear in the Green v. Raley engineering case that regulations can serve as a source for public policy in a TAMNI claim. The District Court conceded as much. That part of the analysis we agree with. Rockwell hasn't disputed this point in its appellate's brief, hasn't provided this Court with any sort of meaningful analysis to say that as a matter of law, these regulations cannot be used as the source of public policy for the TAMNI claim. Now, I can go into those regulations. When you talk about regulations, why don't you be a little bit more specific and tell us what regulations you have in mind. Of course, Your Honor. They are the FDA regulations for investigational new drugs, found at 21 CFR section 312.7, and the SEC regulation FD, found at 17 CFR sections 243.100 to 243.101, and I would direct the Court's attention to the District Court's final order granting summary judgment, where the Court speaks about those regulations as establishing an identifiable public policy. Those are found at excerpts of record 927 through 929. Okay, and you're not relying on ICH principle 2.3? Well, I think those are less regulations, and I think the District Court was correct that those are standards in the industry with respect to these. But they're not regulations? But they're not regulations. Okay, so the answer to my question is you're not relying on those? Correct. Okay, and when you make efficient use of your time, could you cite the record where your client said he thought that there was a violation of those records, communicated that to the employer that has said there was illegal conduct, or gave them reason to believe that that's what he was saying? Yes, Your Honor. He testified in his deposition with respect to occasions where he gave Rockwell notice that he believed that those regulations were being I'd cite the court to excerpts of record 776, 777, 778, and I think the discussion continues actually to 779 and to 784. 784? Correct, and also 785. Did he submit any written document indicating that? No, this was testimonial. I understand it was testimonial. Yes. Did he say he notified them in writing, and if so, did he have copies of it, or did he just say I told him? It was the latter, Your Honor, that he had told them, and that he had told in particular Mr. Cionini that these were these issues, and had actually supplied an email on June 30, 2011, with respect to these issues as it related to the phase 3 clinical test design and the violation of the FDA regulations, as well as the new ESA labeling requirement by the FDA, and Mr. Cionini responded with a chastising email of his own telling Dr. Yochum that he had acted unprofessionally, and that he had acted in a way that Mr. Cionini thought was contrary to the interests of Rockwell, and from that point forward, Rockwell and Mr. Cionini in particular did not continue to include Dr. Yochum in many of the discussions with respect to the clinical testing, and excluded him also with respect to the press releases, which implicated the SEC regulation that we had talked about earlier, as far as making only selective disclosures of information. That's SEC regulation FD, and those are all issues of circumstantial evidence. This is really the second point I wanted to get to, and it dealt with this nexus question. The district court said, we concede that these can be sources of public policy, but I'm deciding as a matter of law that there's no nexus between Dr. Yochum's reports and his termination, and it's very clear that direct evidence of retaliatory animus is rarely available. It's typically a jury question that is based upon circumstantial evidence to determine whether the retaliation played some role in the termination decision. That's the Grant Burton case that we had cited in our briefs, makes that very clear. And the issues with respect to... I've been looking at your sites, and this is what troubled me, and that's why I'm asking the question. Your client was directly asked whether he believed that the conduct that Rockwell is engaging in was illegal, and he said he didn't know about illegal. He thought it was unethical. Correct. Okay. Are you suggesting that it's enough to put the employer on notice, or to come within the illegality requirement of the California law for him to accuse them of unethical behavior? I think what he said was, I'm not a legal expert. I don't know if it's illegal. That's right. And there was an objection that was raised, I think, when it was asked again, that that called for a legal conclusion as to whether the conduct was illegal or not. But in direct response to your question, if he reports conduct that later proves to be illegal, or which somebody, a reasonable reporter in his position, could believe was illegal, then that's sufficient. And to the extent that he was being pressed as to whether he thought it was illegal, he demurred on that. He said, look, I'm not a legal expert. I can't make that legal conclusion. But I thought that it was improper conduct, and I needed to report it, and I was trying to work within Rockwell to try and get this changed. In his mind, it violated what the FDA was requiring them to do with respect to the clinical tests. In his mind, it required what the SEC was requiring as far as these disclosures were concerned, that you can't make these partial disclosures. If there was a difference of opinion within the company, his management, as to whether what they were doing was a violation or an ethical violation, you're saying that they should have understood him to be suggesting that what they were doing was violating the law, actually, not just a choice of what was ethical or not. That's correct. And that's sufficient under California law to trigger the public policy termination. That's correct. And with respect to, especially these issues of health and safety, that these regulations, in particular the FDA regulation, were meant to protect, it was very clear to Dr. Yochum that a violation of these regulations would endanger health and safety, and to that extent was prohibited by that regulation. And I see that my time is getting short. Unless the court has further questions, I'll save the balance for rebuttal. Thank you. All right. Mr. Coombs, do you want to have a say? I do. Thank you. And I would just simply point out that I believe that the trial court's opinion was fashioned appropriately, I think, after exhaustive discovery, that the thorough nature of the lack of meeting the burden of proof and the lack of claim was established. I think the Tammany claim was clearly not met in any way, shape, or form. I think the court started at page 8 by indicating that the ICH practices were specifically, do not create or confer any rights for any purpose. I think, next, the court moved to the regulations that counsel had cited in an earlier brief, and they accurately concluded that the plaintiff failed to offer or demonstrate defendant discharged him for refusing to violate those regulations, performing the obligation imposed by the regulations, or et cetera, as the court indicated. I think, thirdly, the court indicated at footnote 2 that there was clearly nothing more at best in plaintiff's favor, that there had been nothing more than a difference of opinion at most. And the court cited a very specific case of Chelley v. Noel Pharmacy in that footnote, footnote 2, to indicate that such a difference of opinion is insufficient to support a common law claim of wrongful discharge in violation of public policy. So the exact set of facts has already been ruled on, and I think the court properly identified a case which said that. I think, next, the court pointed out that there was a clear contradiction and conflict between plaintiff's deposition testimony and his proffered declaration. And I think the court saw through at page 11 and in footnote 3 that the conflict between these two versions was highlighted not only by the fact that plaintiff did not attempt to explain the contradiction between the two, and also that the conflict between the two versions became even more apparent when considered with plaintiff's declaration that following June 30, 2011, Rockwell's CEO ceased consulting with plaintiffs before issuing press releases and other material intended for public release. So I think the court clearly could see that the declaration was self-serving, that it was not compatible with under oath sworn testimony, which I think flushed out the truth. And I think the court questioned that Dr. Yoakum was asked, was it illegal? And he never was able to in any way, shape, or form indicate any illegality. And he had opportunities throughout the deposition if he felt it was true. At the time, to say yes, he thought it was illegal, and he never did. Counsel, what he said, as I'm not a lawyer, I thought what they were doing was wrong. It was unethical. They weren't making accurate disclosures in these slides and other presentations. So are you saying that he has to cite chapter and verse and get legal advice? Or is it enough in layman's terms to say what you're doing is wrong and it's unethical? Why wouldn't that put Rockwell on notice that that's what he was complaining about and it would be enough to come within the green parameters? Well, I think a couple of things. No, he doesn't have to be an attorney nor cite chapter and verse. I think we acknowledge that. What he's got to do is meet the requirements of Tammany and show that there's a published area of some regulation or constitution or something greater than that to show that there's some illegality there, which clearly can't be done. I guess he could always say he always has an opinion as to whether or not something was done right or wrong as far as how he would procedurally do it. But the claim itself under California law is one that's brought with very, very specific guidelines for a very good reason, so that people aren't just indicating that they have personal feelings, beliefs, opinions, or attitudes that they think something should be done differently or that it's wrong in the procedures or policies or things the way it's promoted. That claim under Tammany under California law is quite specific, and I think the trial court clearly recognized that. In writing the opinion gave the plaintiff every benefit to try to find something, and I think the trial court accurately depicted that the general statements were insufficient to create a dispute of material fact and that he was discharged for insisting that defendants conduct comport with a regulation as suggested. It just simply wasn't there, and I think that's the primary reason. It's just at best a difference of opinion. I don't know if we even agree with that, but that's the best argument that they have. I think none of the other counts were argued. I don't think any of the counts are applicable for intentional infliction of emotional distress or anything of that nature, and there certainly weren't any unpaid wages, and that was covered quite well by the court. Really, I guess what I would suggest is as well there was ample evidence from many, many sources that what occurred first was an indication that Dr. Yoakum had in fact been a poor performer, and then subsequently the argument after that was put forth by a number of colleagues, supervisors, and witnesses that he claims he had a difference of opinion on how things were done, but certainly no regulatory violations nor anything to the level of a Tammany complaint, and I think that's why the opinion is what it is, and I would just simply rest on that. I think the trial court was accurate, gave both sides ample opportunity for discovery, both in a documentary fashion and in deposition fashion, and the burden of proof simply was not met in any way, shape, or form. I'd like to thank the panel for the inconvenience that I caused. Thank you for your courtesy, and I would conclude there and certainly apologize for any inconvenience and for the motion to conduct this by phone to be filed in the wrong court. I take all that onus on myself, not on anybody here or my staff or anything. It's ultimately my responsibility. All right. Thank you very much, Mr. Coombs. Would you like to rebut, Mr. Williams? Yes, Your Honor, briefly. First off, I've heard counsel talk about the fact that the district court got it right with respect to the source of the public policy. The district court ultimately found that there was some basis for these regulations to be a source of public policy, and what it did was it assumed that to be the case, and if the court looks at EOR 928 and 929, it will see that, but then it went on to find that there was no nexus, and it's our position that the issue of nexus is a factual issue. It has to be determined on circumstantial evidence. Certainly the amount of argument that's been raised on the facts by Rockwell demonstrates that there are disputed facts about the motives and what was said and why it was said, and that a jury needs to resolve those facts. Finally, on this sham affidavit issue and the apparent conflict between the deposition testimony and the declaration, the standard that this court has set in the Van Asdale case just clearly was not met here. The declaration did not flatly contradict the deposition testimony, nor did the district court make the requisite finding that it was a sham, and this court in Van Asdale has said you have to do both. You have to make the finding of a sham, and you have to also find that it flatly contradicts as opposed to further explains the prior deposition testimony. The fact that a depo question, a deposition question, leads to testimony that is not necessarily clear is not Dr. Yocum's fault. If the question wasn't properly posed, then he is fully within his rights to clarify his response in a subsequent declaration. Can I just ask one final question? Did he ever invoke Section 312.7 or the SEC FD regulations? Did he have those in mind at all when he was still at Rockwell? Or are these the policy? Are those after the fact regulations that he's evolved to support his notion that what they were doing was unethical? His testimony doesn't make reference to the specific regulations, but it talks about what he thought the FDA required and what he thought the SEC required. The FDA, we've agreed, is a principle. It's not a regulation. No, no, no, that's not correct, Your Honor. I'm talking about the FDA regulation for investigational new drugs. That's 21 CFR Section 312.7. Okay, that's three. That's the FDA. And so what he said echoed exactly what he believed the FDA required by virtue of that regulation. Likewise, with respect to his concern about the press releases, he was talking about his understanding of the SEC regulation, that you cannot make these selective disclosures of nonpublic information. And that's what he said to Rockwell at the time. His testimony was that that is what he conveyed, yes. My impression was that he didn't point out a single instance of noncompliance of which he knew while employed at Rockwell, that he talked about a slide show which was shown 10 days after he'd been terminated. And that's incorrect. That was the district court's conclusion, and this September 2011 slide show took on some significance for the district court, but there was testimony where he indicated that on six prior occasions, half a dozen I think his testimony was, that he indicated that he thought the information that Rockwell wanted to include in the slide shows was improper and in violation of the SEC disclosure regulations. So this question about the September 2011 slide show was a sidetrack. He actually testified, and Chione actually acknowledged that he had asked Dr. Yocum for his input on prior slide shows, and Dr. Yocum supplied it, and a lot of times it was ignored. So what the 2011 slide show demonstrated was circumstantial evidence of the kind of disclosure that Rockwell wanted to make once they got Dr. Yocum out of the way, once he was no longer in the picture and wasn't there to make any sort of protest that that information was not accurate or incorrect, and in that respect it's circumstantial evidence of retaliatory animus. And your position is that Yocum told Rockwell that the information they were putting in the slide show was violative of public policy before they put it in the slide show? That's correct, Your Honor. And he said he did... Notations that you've given us, ER-776 through ER-779 and 784 and 5, right? With the court's indulgence, I can verify that very quickly. That's on 776-777. All right. At the beginning of your presentation, you answered that question. Thank you very much. And if I could just say 784 as well. That is when he... Have that in here. He was asked, and that's when he said it a half dozen times. 784, 785, yeah. Thank you very much. Thank you. And thank you, and we will stand adjourned until tomorrow morning at 9 o'clock.
judges: Fernandez, Fisher, Bea